UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN WEAVER and DIANE WEAVER, parents of
J.W., a disabled child,

                        Plaintiffs,

   -v-

MILLBROOK CENTRAL SCHOOL DISTRICT,

                        Defendant.

09-CV-692 (KMK)

OPINION AND ORDER

---

Appearances:

RosaLee Charpentier, Esq.
Law Office of Salamon Davis
New York, NY
*Counsel for Plaintiffs*

Mark Craig Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      John and Diane Weaver (collectively "Plaintiffs") bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking to overturn the determination of the State Review Officer ("SRO") that Millbrook Central School District ("Defendant" or "Millbrook") is not required to reimburse Plaintiffs for their unilateral placement of their child, J.W., at the Kildonan School ("Kildonan"), and seeking pendency payments. Defendant moves for summary judgment. Plaintiffs also request summary judgment.[1] For the reasons given below, Defendant's Motion is granted.

---

[1] Plaintiffs' counsel failed to appear at the pre-motion conference at which Defendant was granted permission to file its Motion. Plaintiffs' motion, therefore, could be denied for failure to follow the Court's individual rules. However, it is instead denied for the reasons given

I.  Background

A.  Factual Background

J.W. is a learning-disabled child who attended sixth grade in 2007-08, the only year in dispute in this case.  (Def.'s Rule 56.1 Statement ("Def.'s 56.1 Stmt.") ¶¶ 1, 2; Opp'n to Def.'s Rule 56.1 ("Pls.' 56.1 Stmt.") ¶¶ 1, 28.)² Plaintiffs removed J.W. from public school and placed him at Kildonan in September 2004.  (Pls.' 56.1 Stmt. ¶ 48.)³  Plaintiffs sought tuition reimbursement for the 2004-05 and 2005-06 years, and resolved those claims by settlement with Defendant.  (*Id.* ¶ 49.)  Though Plaintiffs offer conflicting statements about when they received tuition reimbursement for the 2006-07 year, those payments are not in dispute here.  (*Id.* ¶¶ 53-54 (denied by Defendant).)  On May 3, 2007, Defendant's Committee on Special Education ("CSE") proposed a new individualized education program ("IEP") for the 2007-08 year.  (*Id.* ¶ 55.)  A hearing was held before an impartial hearing officer ("IHO"), who determined on September 23, 2008 that the proposed IEP provided a free appropriate public education ("FAPE") for J.W.  (Findings of Fact & Decision, Case No. 32,873 (Sept. 23, 2008) ("IHO Op.") 9 (attached as Ex. A to Def.'s Answer).)  The IHO also concluded, however, that the District was obligated to fully reimburse the parents for J.W.'s tuition at Kildonan for the 2007-08 school year as payment for the student's pendency placement.  (*Id.* at 4-5, 9.)  Plaintiffs appealed and Defendant cross-appealed to the SRO.  (Pl.'s 56.1 Stmt. ¶ 66.)  The SRO determined that the IEP did not provide a FAPE, but that Plaintiffs' placement of J.W. at Kildonan was not appropriate.

---

below.

² Hereinafter, citations to a "Rule 56.1 Stmt." are citations to an undisputed fact unless otherwise indicated.

³ Defendant's response to Pls.' 56.1 Stmt. is contained in Defendant's Reply 56.1 Stmt. (Reply to Pl.'s [sic] Opp'n to Def.'s Rule 56.1 Statement.)

(Application of a Student with a Disability, by his Parents, for Review of a Determination of a Hr'g Officer Relating to the Provision of Educ. Servs. by the Bd. of Educ. of the Millbrook Cent. Sch. Dist., No. 08-130 (Dec. 8, 2008) ("SRO Op.") 14-15, 19 (attached as Ex. B to Def.'s Answer).)  Defendant does not contest the SRO's finding that the IEP did not provide a FAPE. (Pl.'s 56.1 Stmt. ¶ 69.)

### 1.  SRO's Determination that Plaintiffs' Placement Was Not Appropriate.

The SRO determined that Plaintiffs had not met their burden of demonstrating that Kildonan was an appropriate placement for J.W. primarily because of the lack of detailed evidence in the record.  (SRO Op. 18-19.)  The SRO noted that "[t]he Kildonan interim progress reports contained in the hearing record describe both the school's special education program, and the student's progress within it, in vague, nebulous terms that render a specific analysis of either exceedingly difficult."  (*Id.* at 18.)  More specifically, the SRO found that "[t]he[] reports do not detail the student's specific deficits in reading and mathematics, nor do they contain sufficiently detailed information regarding the curriculum, level of materials being used[,] or objective academic expectations for the student's content area classes," and that "Kildonan's grading system as utilized in its interim progress reports [was] so overly broad as to prevent any meaningful assessment of the student's actual progress."  (*Id.* at 18-19.)

The SRO based these conclusions on, inter alia: (1) a grading system with only three gradations — "beginning," reflecting 0%-25% "compliance relative to a given skill," "developing," reflecting 25%-80% compliance, and "secure," reflecting ≥80% compliance; (2) mixed testing results showing improvement in some areas but regression or no change in others; and (3) reports from teachers and tutors which reported progress in some areas and regression in others, and which did not provide specifics about skills mastered.  (*Id.* at 16-18 (internal quotation marks omitted).)

Kildonan's interim reports demonstrate mixed progress, which is summarized in the following table:[4]

|            | Math          | Literature | History & Science | Music   | Elementary Art | Social Studies | Science |
|------------|---------------|------------|-------------------|---------|----------------|----------------|---------|
| 10/17, 2007 | 2B, 7D, 1S   | 7D, 3S     | NA                | NA      | NA             | 5D, 5S         | 5D, 5S  |
| 11/16, 2007 | 10D, 1S      | 8D, 3S     | 5D, 5S            | 8D, 2S  | 8D, 2S         | NA             | NA      |
| 1/21, 2008  | 8D, 2S       | 5D, 5S     | NA                | NA      | NA             | 4D, 6S         | 4D, 6S  |
| 3/11, 2008  | 2B, 8D, 1S   | 5D, 6S     | 2D, 8S            | 10D     | 6B, 4D         | NA             | NA      |
| 4/21, 2008  | 9D, 2S       | 5D, 5S     | NA                | NA      | NA             | 3D, 8S         | 3D, 8S  |

(Parents' Exs. ("Pls.' Exs.") E, F, N, O, V.)  Thus, in general, and by Kildonan's metrics, between October 2007 and April 2008, J.W. improved in mathematics, literature, history, social studies, and science, and regressed in music and elementary art.  The November 2007 and March 2008 reports are accompanied by general descriptions of the courses offered in certain subject areas and overviews of J.W.'s capacity in those areas without any description of skills acquired or specific, measurable goals.  (*Id.* Exs. E-F.)  A more detailed analysis of the reports suggests that while the overall direction of J.W.'s progress was positive, the road was bumpy.  For example, a comparison of the two most recent reports – March 2008 and April 2008 – demonstrates that J.W.'s overall performance in Literature remained the same, while his performance on specific measured criteria was mixed, showing improvement in some areas and

---

[4] B = Beginning; D = Developing; S = Secure.

regression in others. (*Id.* Exs. E, V.)[5] Similarly, the two areas in mathematics in which J.W. was rated B in October 2007 are not the same as the two areas in which J.W. was rated B in March 2008. (*Id.* Exs. E, N.) Finally, after the October 2007 review, J.W. was placed in a special class of only four students who needed more intensive help with mathematics. (IHO Tr. 459-61.) J.W.'s other classes (aside from music and art) appear to have contained a maximum of six students. (*Id.* at 464.)

Kildonan also conducted standardized testing of J.W. in twelve areas in May 2006, October 2006, May 2007, October 2007, and May 2008, the results of which are summarized below (**bold** indicates improvement, *italics* indicate regression):

---

[5] Between March and April 2008, J.W. improved from a "D" to an "S" in "understands concepts" and "builds on ideas and makes connections," while he moved from an "S" to a "D" in the areas of "demonstrates perseverance" and "demonstrates academic risk taking." (Pls.' Exs. E, V.)

|  | May, 2006 | October, 2006 | May, 2007 | October, 2007 | May, 2008 |
|---|---|---|---|---|---|
| Word Identification | 14th %ile | **27th %ile** | *14th %ile* | **27th %ile** | *20th %ile* |
| Word Attack | 27th %ile | *24th %ile* | **32nd %ile** | *25th %ile* | **26th %ile** |
| GORT[6] Rate | 2nd %ile | *1st %ile* | 1st %ile | **5th %ile** | **9th %ile** |
| GORT Accuracy | 2nd %ile | *1st %ile* | 1st %ile | **9th %ile** | **16th %ile** |
| GORT Fluency | 1st %ile | *<1st %ile* | < 1st %ile | **5th %ile** | 5th %ile |
| Vocabulary | 9th %ile | **14th %ile** | **29th %ile** | **71st %ile** | *67th %ile* |
| Comprehension | 30th %ile | *21st %ile* | **28th %ile** | 28th %ile | **45th %ile** |
| Total Reading | 17th %ile | *16th %ile* | **27th %ile** | **47th %ile** | **56th %ile** |
| Spelling | 2nd %ile | **4th %ile** | *2nd %ile* | **4th %ile** | **8th %ile** |
| Mathematics – Concepts | 14th %ile | **54th %ile** | *43rd %ile* | *5th %ile* | *.07th %ile* |
| Mathematics – Computation | 2nd %ile | **6th %ile** | **9th %ile** | *1st %ile* | **11th %ile** |
| Mathematics – Total | 5th %ile | **22nd %ile** | **24th %ile** | *2nd %ile* | *.06th %ile* |

(Pls.' Exs. II, NN.) As this table shows, J.W.'s progress was uneven. The overall trend is positive in the "reading" areas, but generally negative in the mathematics areas. The areas in which J.W. had regressed between May 2006 and May 2008 were Word Attack, Mathematics – Concepts, and Mathematics – Total. The decline in mathematics between October 2007 and May 2008 is surprising in view of the more intensive mathematics instruction J.W. was receiving. (IHO Tr. 459-61.)

---

[6] GORT stands for "Gray Oral Reading Test" and involves students reading short passages aloud. (Pls.' Ex. G.)

6

The record also contains letters from J.W.'s teachers, both dated May 9, 2008, providing a general outline of J.W.'s progress. (Pls.' Exs. T, U.) Similarly, the record contains one of Kildonan's brochures, which explains that the school was founded to provide an educational alternative for dyslexic students and that it offers one-on-one tutorials following the Orton-Gilligham language training system, as well as a core curriculum that emphasizes multisensory teaching and other techniques designed for students with specific language difficulties. (*Id.* Ex. I, at unnumbered second-fourth pages.) The fact that J.W. received one-on-one tutoring for fifty minutes daily also is confirmed in the record. (IHO Tr. 462.)[7]

### 2. Pendency Payments

On September 10, 2007, a different IHO had found that, with respect to the 2006-2007 school year, Defendants had not provided J.W. a FAPE and that Kildonan was an appropriate placement for him. (Pls.' 56.1 Stmt. ¶ 51.) That decision was not appealed and so became final. (*Id.* ¶ 52.) The IHO in this case found that the Defendant was liable to Plaintiffs for tuition for the 2007-08 school year because Kildonan was the "student's pendency placement." (IHO Op. 5.) The SRO agreed that "Kildonan constitute[d] the student's pendency placement by virtue of the [Defendant's] election not to appeal the prior [IHO's] decision," but held that the pendency requirement was not triggered until February 28, 2008, when Plaintiffs filed their due process

---

[7] To support their claim that they "overwhelmingly demonstrated" that their placement was appropriate, Plaintiffs list, without elaboration, argument, or explanation, a string of exhibits. (Mem. of Law in Opp'n to Def's Mot. & in Supp. S.J. in Pls.' Favor ("Pls.' Mem.") 9.) Some of those exhibits are discussed above. Of the remaining, some are duplicative (Pls.' Exs. G, DD, EE, FF, GG, KK; IHO Tr. 1054), some are writing samples (Pls.' Exs. W, BB, MM; Dist. Ex. ("Def.'s Ex.") SDIV-I), and some irrelevant to the questions before the Court, (Pls.' Exs. P, HH; Def.'s Ex. SDIV-R). Others are older reports of the kind outlined above, or similar to other evidence discussed above, and do not affect the analysis. (Def.'s Exs. SDIV-B through SDIV-H, SDIV-J through SDIV-Q, SDIV-S through SDIV-X.)

complaint notice. (SRO Op. 20.) In doing so, the SRO held that Plaintiffs' letter of August 21, 2007, which informed the Defendant that Plaintiffs rejected the proposed IEP, did not trigger the pendency provisions. (*Id.*)

### B. Procedural Background

Plaintiffs initiated this lawsuit on January 23, 2009. Due to delay caused by Plaintiffs' counsel, this motion was not fully submitted until May 7, 2010. The Court did not hold oral argument.

## II. Discussion

### A. Standard of Review

#### 1. IDEA

Unlike the case of an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). Thus, while the parties "may call the procedure a motion for summary judgment, the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks and ellipse omitted); *see also P. ex rel. Mr. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008) ("[W]hile our review is de novo, it is tinged with a significant degree of deference to the state educational agency, as we are essentially acting in an administrative-law-style capacity."). Courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by "'the preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380

(2d Cir. 2003) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)); *see also M.S. ex rel. S.S. v. Bd. of Educ.*, 231 F.3d 96, 102 (2d Cir. 2000), *abrogated on other grounds by Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005).  "In conducting this review, the court may reject factual findings that are not supported by the record or are controverted by the record." *C.B. & R.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, No. 02-CV-4620, 2005 WL 1388964, at *13 (E.D.N.Y. June 10, 2005).

The Supreme Court and the Second Circuit have cautioned "that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-08 (1982)).  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (quoting *Rowley*, 458 U.S. at 206, 208) (internal quotation marks and brackets omitted); *see also A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (same).  Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *M.S.*, 231 F.3d at 102 (internal quotation marks omitted).  Thus, where an SRO decision "is reasoned and supported by the record," the district court should not disturb it. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007); *see also Newington*, 546 F.3d at 118 ("'Deference is particularly appropriate

when the state hearing officers' review has been thorough and careful.'" (quoting *Walczak*, 142 F.3d at 129) (alteration omitted)).[8]

### 2. Claims for Tuition Reimbursement

Plaintiffs seek tuition reimbursement from Defendant on the basis that the CSE's IEP did not provide a FAPE. In *Forest Grove School District v. T.A.*, 129 S. Ct. 2484 (2009), the Supreme Court reaffirmed that the IDEA permits parents to seek reimbursement for the private placement of a child who has not received a FAPE. *Id.* at 2496. Parents may receive tuition reimbursement even if the child has not previously received special education or related services from a public school or agency. *See id.* at 2491-93; *see also N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-5120, 2011 WL 3273922, at *16 (E.D.N.Y. July 29, 2011). Generally, tuition reimbursement for a private placement is warranted if: (1) "the proposed IEP was inadequate to afford the child an appropriate public education, and (2) [] the private education services obtained by the parents were appropriate to the child's needs." *Walczak*, 142 F.3d at 129 (citing *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)); *see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (same). Even if these two requirements are satisfied, however, the Court retains discretion whether to award tuition reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the

---

[8] Deference to the SRO is appropriate even where the SRO, at least in part, has disagreed with the IHO. *See Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 547 n.9 (S.D.N.Y. 2010); *see also A.C.*, 553 F.3d at 171 ("We 'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.'" (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)); *Watson ex rel. Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004) ("[D]eference to the final decision issued by a state agency on an issue of educational methodology is no less appropriate simply because the SRO has disagreed with the IHO."), *aff'd*, 142 F. App'x 9 (2d Cir. 2005).

parents for the cost of [private] enrollment."). "Moreover, because the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G.*, 459 F.3d at 363-64 (quoting *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 374 (1985)) (alteration in original). Courts also "retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school." *Forest Grove*, 129 S. Ct. at 2496.

Because Defendant does not contest the SRO's finding that the IEP was inappropriate, the Court focuses solely on whether Kildonan was an appropriate placement for J.W. during the 2007-08 school year. On this issue, Plaintiffs bear the burden of proof. *See A.C.*, 553 F.3d at 171-72; *Frank G.*, 459 F.3d at 364 ("Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate."); *R.B. v. N.Y.C. Dep't of Educ.*, 713 F. Supp. 2d 235, 238 (S.D.N.Y. 2010) (same).

"Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement." *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459 F.3d at 364) (alteration omitted); *see also Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 418 (S.D.N.Y. 2011) (same). Thus, in determining whether the parents' unilateral placement is appropriate, "the issue turns on whether [the] placement . . . is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G.*, 459 F.3d at 364 (quoting *Rowley*, 458 U.S. at 207); *see also Mr. & Mrs. A.*, 769 F. Supp. 2d at 418 (same); *R.B.*, 713 F. Supp. 2d at 244 (same); *C.B.*, 2005 WL 1388964, at *16 (same).

"No one factor is necessarily dispositive in determining whether parents' unilateral placement is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G.*, 459 F.3d at 364 (quoting *Rowley*, 458 U.S. at 207). The ultimate question is whether the private placement "provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *Gagliardo*, 489 F.3d at 115 (emphasis in original) (internal quotation marks omitted); *see also Frank G.*, 459 F.3d at 365 ("[C]ourts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs."); *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 444 (S.D.N.Y. 2010) ("The Court must find that a preponderance of the evidence supports the finding that the placement at [the private school] provided [the student] with education instruction specifically designed to meet his unique needs.").

A court may consider a student's progress in a private placement setting, but the Second Circuit has made clear that the focus must remain on whether the placement satisfies the student's unique needs. "Grades, test scores, and regular advancement . . . constitute *evidence* that a child is receiving educational benefit," *Frank G.*, 459 F.3d at 364 (emphasis added), but "academic success at the private placement alone is not sufficient," *E.S.*, 742 F. Supp. 2d at 444. Thus, while "[a] private placement meeting th[e] standard is one that is 'likely to produce progress, not regression,'" *Gagliardo*, 489 F.3d at 112 (quoting *Walczak*, 142 F.3d at 130), and "a child's progress is relevant to the court's review," "such progress does not itself demonstrate that a private placement was appropriate," *id.* at 115. The flip side also is true: lack of progress itself does not mean that the parents' placement was inappropriate. *See P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, No. 09-CV-1472, 2011 WL 3625088, at *14-15 & n.12 (E.D.N.Y. Mar.

12

17, 2011) (concluding that private placement was appropriate, even though plaintiffs had not provided any evidence of student's progress at placement, based on testimony of educational coordinator at private school who credibly demonstrated that "[t]he [private] program . . . provide[d] the very services [the court had] found lacking in [student's] IEP").

Notably, "the standard applied to . . . parental placements is less restrictive and subject to fewer constraints than that applied to the school authorities." *C.B.*, 2005 WL 1388964, at *16; *see also M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 163 (S.D.N.Y. 2010) (noting that parents' "unilateral placement does not have to 'meet the IDEA definition of a free appropriate public education.'" (quoting *Frank G.*, 459 F.3d at 364)); *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010) (noting that "[t]he standards for determining whether a private school placement is 'appropriate' under the IDEA closely resemble, but do not mirror, the standards for assessing the adequacy and appropriateness of the proposed public placement."). For example, "[t]he parents' unilateral placement need not have certified special education teachers or an IEP for the disabled student in order to qualify as appropriate." *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F. Supp. 2d 313, 326 (S.D.N.Y. 2005) (citing *Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 14 (1993)); *see also R.E. v. N.Y.C. Dep't of Educ.*, No. 10-CV-3176, 2011 WL 924895, at *13 (S.D.N.Y. Mar. 15, 2011) (same); *cf. Frank G.*, 459 F.3d at 364 (noting that "[a]n appropriate private placement need not meet state education standards"). Nor is the parents' placement "'subject to the same mainstreaming requirements as a school board.'" *Frank G.*, 459 F.3d at 364 (quoting *M.S.*, 231 F.3d at 105); *see also M.H.*, 712 F. Supp. 2d at 163 (same); *Gabel*, 368 F. Supp. 2d at 326 ("[W]hile students with disabilities should be educated in the least restrictive environment, parents are not held to the same strict standard of placement as school districts are." (citation omitted)). "Nonetheless, IDEA's requirement that an appropriate education be in

13

the mainstream to the extent possible remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate . . . ." *M.S.*, 231 F.3d at 105 (reversing district court's award of tuition to student's parents where SRO refused tuition on the grounds that the private placement was too restrictive); *see also Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 105 (2d Cir. 1998) ("[T]he presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." (internal quotation marks omitted)).[9]

### B. Plaintiffs' Placement

As noted above, Plaintiffs bear the burden of demonstrating that the SRO's determination that Kildonan was not an appropriate placement is not supported by "the preponderance of the

---

[9] The Second Circuit recently adopted a two-part test employed by several other circuit courts for determining whether an IEP provides the least restrictive environment possible: (1) "whether a student can be satisfactorily educated in the regular classroom with the benefit of supplemental aids and services;" and (2) if the school district was justified in removing the student from the mainstream classes, "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *Newington*, 546 F.3d at 120; *accord L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004); *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1403-04 & n.5 (9th Cir. 1994); *Oberti ex rel. Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1215 (3d Cir. 1993). In considering the first prong, courts should consider whether "reasonable efforts [were made] to accommodate the child in a regular classroom," "the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class," and potential "negative effects . . . on the education of the other students in the class." *Newington*, 546 F.3d at 120; *see also L. ex rel. Mr. F. v. N. Haven Bd. of Educ.*, 624 F. Supp. 2d 163, 180-81 (D. Conn. 2009) (same). As noted above, parents are not held to the same mainstreaming requirements as school districts. However, because mainstreaming may be a factor in deciding the appropriateness of a private placement, and because the test is designed to help courts decide whether a placement is the least restrictive environment, the above factors may be useful in determining the overall appropriateness of the parental placement. *See M.H.*, 712 F. Supp. 2d at 165 (evaluating whether parents' placement was least restrictive environment using the *Newington* test).

evidence." *Grim*, 346 F.3d at 380 (internal quotation marks omitted); *see also Frank G.*, 459 F.3d at 364 (noting that the burden is on the parents to demonstrate that a placement was appropriate). Despite the fact that the SRO based his decision largely on an absence of concrete information about the program J.W., in particular, was offered at Kildonan, Plaintiffs have not availed themselves of the opportunity to present new, and more specific, evidence to fill in the gaps identified by the SRO. *See Grim*, 346 F.3d at 380 (noting that courts should "tak[e] into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties"); *see also Arlington Cent. Sch. Dist. v. D.K.*, No. 02-CV-2117, 2002 WL 31521158, at *9 (S.D.N.Y. Nov. 14, 2002) ("[D]ue weight [] should be accorded to the SRO's determination, particularly where, as here, the parties have presented no new evidence . . . ." (internal quotation marks omitted)).[10]

As reflected above, the record certainly contains some evidence regarding J.W.'s progress at Kildonan, as well as the general educational philosophy of Kildonan and the class size and tutoring that J.W. received there. However, the SRO's conclusions about Plaintiffs' placement are substantiated by the evidence about J.W.'s significant and continuing deficits in reading and mathematics and the dearth of evidence about the level or content of the curriculum J.W. was offered. Indeed, as the SRO noted, the record does not provide sufficient evidence to

---

[10] Plaintiffs' failure to introduce more evidence is baffling given that Plaintiffs, in their Complaint, requested that this Court conduct "a hearing to take . . . additional evidence." (Compl. ¶ 6.) However, Plaintiffs did not follow up on this request – they did not write a letter to the Court or even appear at the one conference held in this case (a conference requested by Defendant). This request is not reiterated in Plaintiffs' Memorandum of Law, nor is there any suggestion as to what the new evidence might be. Plaintiffs do reference exhibits that the IHO did not allow them to enter and assert that they are included in the administrative record (Pls.' Mem. 5), but Plaintiffs' Memorandum before the IHO (which contained these exhibits) is not contained in the record provided to the Court. Plaintiffs have similarly failed to substantiate their claim of procedural irregularity. (Compl. ¶ 6.)

understand the reasons behind J.W.'s progress and regression, or what skills J.W. mastered, or why J.W.'s mathematical ability continued to decline even after the more intensive tutoring began. (SRO Op. 18-19.) J.W.'s uneven progress provides significant support for the SRO's conclusion that, whatever program Kildonan provided him, it was not appropriate to J.W.'s needs. *Cf. Frank G.*, 459 F.3d at 366-67 (noting that IHO and SRO had concluded that placement was inappropriate because evidence showed lack of progress there, while district court had overruled that determination based on other evidence that showed significant progress; that evidence, together with the program offered at placement, supported district court's conclusion that placement was appropriate). All of these facts in the record support the SRO's conclusion that Plaintiffs did not meet their burden of justifying their request for reimbursement. (SRO Op. 19.) *See M.S.*, 231 F.3d at 105 ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where . . . the district court's decision was based solely on the record that was before the SRO."); *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 432 (S.D.N.Y. 2007) (holding that parents had failed to show Kildonan School was appropriate placement because the SRO's conclusion "that Kildonan did not meet [the student's] special needs in numerous respects [was] sound and fully supported by the evidence"), *aff'd*, 293 F. App'x 20 (2d Cir. 2008).

      The only way this Court could determine that the SRO erred is by crediting the testimony of J.W.'s father, who stated his belief that J.W. could not succeed in a more mainstreamed environment (IHO Tr. 464-67), and by relying generally on the specialized nature of the care provided by Kildonan. Even this, however, would not establish that Kildonan "provides

education instruction *specifically* designed to meet the *unique* needs of [J.W.]." *Gagliardo*, 489 F.3d at 115 (emphasis in original) (internal quotation marks omitted). The father's testimony is the sort of evidence the Second Circuit has warned district courts against relying on to overturn well reasoned decisions of SROs. *See M.S.*, 231 F.3d at 105 (holding that district court "inappropriately substituted its own subjective judgment about what are appropriate measures for educational progress" where the court considered, *inter alia*, student's father's testimony that student was happier and read more while at private placement). Moreover, neither of these points undercuts the SRO's conclusion, based on a thorough review of the record before him, that the Kildonan placement was not appropriate for J.W. during the 2007-2008 school year. *See Matrejek*, 471 F. Supp. 2d at 428-30 (concluding that parents failed to demonstrate that Kildonan School was appropriate placement for child because school's program did not satisfy several of child's needs and child's progress there had been uneven).[11] Defendant's Motion for Summary Judgment on the issue of the Plaintiffs' placement, therefore, is granted.

### C. Pendency Payments

All Parties, and the SRO, agree that Kildonan was J.W.'s pendency placement for 2007-08, but Plaintiffs appeal the portion of the SRO's Opinion that held that Defendant's liability under a pendency theory began on February 28, 2008, when Plaintiffs filed a due process complaint. (SRO Op. 20; Compl. ¶¶ 45-46.) Defendant moves for summary judgment on this point and, though Plaintiffs oppose the Motion, Plaintiffs cite no law and make no arguments in

---

[11] The Court notes that counsel for Plaintiffs asserts that the SRO in this case was biased (Pls.' Mem. 10-11), citing absolutely no evidence to substantiate such a serious claim.

defense of their position. (Pls.' Mem. 13.) Plaintiffs sent a "10 day letter" to Defendant in August 2007. (Pls.' 56.1 Stmt. ¶ 68 (denied by Defendant).) The SRO concluded that "[i]n order to invoke the pendency provisions of the IDEA, a due process proceeding must be pending," and that the Plaintiffs' "letter of August 21, 2007 merely informed the district of the [Plaintiffs'] rejection of the program recommended pursuant to the May 3, 2007 IEP, and did not by itself initiate a due process proceeding." (SRO Op. 20.) The SRO, therefore, concluded that the pendency provisions of the IDEA were not triggered "until February 28, 2008, the date of [Plaintiffs'] due process complaint notice." (*Id.* at 21.)

   The IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State . . . and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). The plain language of the statute, therefore, suggests that the provision only applies "during the pendency of any proceedings," and not, as Plaintiffs suggest, before such a proceeding has begun. *See Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 160 (2d Cir. 2004) (noting that "federal and state law require that the child remain in his or her then-current educational placement" "[d]uring the pendency of special education proceedings"); *Bd. of Educ. v. Schutz*, 290 F.3d 476, 485 (2d Cir. 2002) (holding that the school district was "required to pay the costs of tuition at Kildonan during the pendency of the proceedings"). In *Mackey v. Board of Education for the Arlington Central School District*, No. 02-CV-8360, 2005 U.S. Dist. LEXIS 15908 (S.D.N.Y. Mar. 9, 2005) ("*Mackey*"), the court dealt with an almost identical situation to the one presented in this case. The plaintiffs in that case had objected to the defendant school district's placement at a

meeting, and informed the school district that they would make a unilateral private placement. *Id.* at *4. However, the plaintiffs waited over two months to request an impartial hearing. *Id.* at *5. Because this delay could not be attributed to the defendant, the court held that the plaintiffs' initial objections did not trigger the defendant district's pendency obligations. *Id.* at *5-6 & n.3.

Here, the August 21, 2007 letter that Plaintiffs wrote to Defendant rejected Defendant's proposed IEP, and informed Defendant that Plaintiff intended to seek reimbursement for placing J.W. at Kildonan. (Pls.' Ex. D.) The letter ends by stating "[i]t is my understanding that we have one year from the date of the IEP for an impartial hearing to take place. . . . You can expect to hear from us in the near future requesting an impartial hearing." (*Id.*) Plaintiffs, therefore, knew that they were not initiating proceedings by sending this letter and, as in *Mackey*, the delay between Plaintiffs' objections and the start of the proceedings that triggered Defendant's pendency obligations can only be attributed to Plaintiffs. Plaintiffs provide no reasons why the Court should not follow the rule laid out in *Mackey* and, therefore, Defendant's Motion for Summary Judgment on this issue is granted.

### III. Conclusion

For the reasons given above, Defendant's Motion for Summary Judgment is granted. The Clerk of the Court is respectfully request to terminate the pending motion (Dkt. No. 11), enter judgment for Defendant, and close the case.

SO ORDERED.

DATED:   White Plains, New York
         September 6, 2011

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (via ECF)

RosaLee Charpentier, Esq.
The Law Office of Salamon Davis
39 West 37th Street, 3rd Floor
New York, N.Y. 10018
rlc831@earthlink.net

Mark Craig Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
21 Van Wagner Road
Poukeepsie, N.Y. 12603
mrushfield@shawperelson.com